## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

Kurt E. H.,                                    Case No. 21-cv-1859 (TNL)

        Plaintiff,

v.                                                    **ORDER**

Kilolo Kijakazi,
Acting Commissioner of Social Security,

        Defendant.

---

Edward C. Olson, Reitan Law Office, 80 South Eighth Street, Suite 900, Minneapolis, MN 55402 (for Plaintiff); and

Ana H. Voss, Assistant United States Attorney, 300 South Fourth Street, Suite 600, Minneapolis, MN 55415; and James D. Sides and Linda H. Green, Special Assistant United States Attorneys, Social Security Administration, 6401 Security Boulevard, Baltimore, MD 21235 (for Defendant).

---

## I. INTRODUCTION

Plaintiff Kurt E. H. brings the present case, contesting Defendant Commissioner of Social Security's denial of his application for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. § 401 *et seq.* The parties have consented to a final judgment from the undersigned United States Magistrate Judge in accordance with 28 U.S.C. § 636(c), Fed. R. Civ. P. 73, and D. Minn. LR 72.1(c).

This matter is before the Court on the parties' cross-motions for summary judgment. ECF Nos. 19, 21. Being duly advised of all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that Plaintiff's Motion for Summary Judgment,

ECF No. 19, is **DENIED**, and the Commissioner's Motion for Summary Judgment, ECF No. 21, is **GRANTED**.

## II. PROCEDURAL HISTORY

Plaintiff applied for DIB asserting that he has been disabled since September 2014 due to, among other impairments, problems with his right leg and ankle, including arthritis.[1]  Tr.  16, 64.   Plaintiff's application was denied initially and again upon reconsideration.  Tr. 16, 71, 72, 82, 84.

Plaintiff appealed the reconsideration of his DIB determination by requesting a hearing before an administrative law judge ("ALJ").  Tr. 16, 116-17.  The ALJ held a hearing in November 2020, and issued an unfavorable decision.   Tr. 16-27, 34-63. Plaintiff requested review from the Appeals Council, which was denied.  Tr. 1-4.

Plaintiff then filed the instant action, challenging the ALJ's decision.   Compl., ECF No. 1.  The parties have filed cross motions for summary judgment.  ECF Nos. 19, 21.  This matter is now fully briefed and ready for a determination on the papers.

## III. ALJ'S DECISION

In relevant part, the ALJ found that Plaintiff had the severe impairments of "2014 fracture, status post open reduction internal fixation, and osteoarthritis of the right ankle," and neither of these impairments individually or in combination met or equaled a listed impairment in 20 C.F.R. pt. 404, subpt. P, app. 1.  Tr. 18-24.  In considering whether

---

[1] While Plaintiff also claimed disability on the basis of atrial fibrillation, Tr. 64, 74, the issues at hand relate to Plaintiff's ankle impairments and use of a cane.

Plaintiff's ankle impairments met or equaled a listed impairment, the ALJ noted that Plaintiff alleged "limited ambulation and use of a cane."  Tr. 20.

The ALJ found that

> [Plaintiff] had the residual functional capacity to do light work[2] . . . , sitting for 6 hours and standing and/or walking for 6 hours in an 8-hour workday, occasional operation of foot controls with the right lower extremity, occasional climbing of ramps and stairs, ladders, ropes or scaffolds, and balancing on narrow slippery or erratically moving surfaces, frequent stooping, kneeling, crouching, and crawling, and allowing for a 15-minute break to sit down every 2 hours.

Tr. 24.  In assessing Plaintiff's residual functional capacity, the ALJ again noted Plaintiff "reported reduced ambulation and imbalance with neuropathy and use of a cane."  Tr. 25. The ALJ found, however, that Plaintiff's functioning "gradually improv[ed]" over time and there was "no confirmed medical necessity" for use of a cane.  Tr. 25.

Based on Plaintiff's age, education, work experience, and residual functional capacity, the ALJ found that Plaintiff was capable of performing his past relevant work as a file clerk. Tr. 26-27. Accordingly, the ALJ concluded that Plaintiff was not under a disability through the date he was last insured.  Tr. 27.

---

2

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.

20 C.F.R. § 404.1567(b).

# IV. ANALYSIS

This Court reviews whether the ALJ's decision is supported by substantial evidence in the record as a whole. *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). "[T]he threshold for such evidentiary sufficiency is not high." *Id.* "It means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (quotation omitted); *see, e.g.*, *Chismarich v. Berryhill*, 888 F.3d 978, 979 (8th Cir. 2018) (defining "substantial evidence as less than a preponderance but enough that a reasonable mind would find it adequate to support the conclusion" (quotation omitted)).

This standard requires the Court to "consider both evidence that detracts from the [ALJ's] decision and evidence that supports it." *Boettcher v. Astrue*, 652 F.3d 860, 863 (8th Cir. 2011); *see Grindley v. Kijakazi*, 9 F.4th 622, 627 (8th Cir. 2021). The ALJ's decision "will not [be] reverse[d] simply because some evidence supports a conclusion other than that reached by the ALJ." *Boettcher*, 652 F.3d at 863; *accord Grindley*, 9 F.4th at 627; *Perks v. Astrue*, 687 F.3d 1086, 1091 (8th Cir. 2012). "The court must affirm the [ALJ's] decision if it is supported by substantial evidence on the record as a whole." *Chaney v. Colvin*, 812 F.3d 672, 676 (8th Cir. 2016) (quotation omitted). Thus, "[i]f, after reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision." *Perks*, 687 F.3d at 1091 (quotation omitted); *accord Chaney*, 812 F.3d at 676.

Disability benefits are available to individuals who are determined to be under a disability. 42 U.S.C. § 423(a)(1); *accord* 20 C.F.R. § 404.315. An individual is considered to be disabled if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *see also* 20 C.F.R. § 404.1505(a). This standard is met when a severe physical or mental impairment, or impairments, renders the individual unable to do his previous work or "any other kind of substantial gainful work which exists in the national economy" when taking into account his age, education, and work experience. 42 U.S.C. § 423(d)(2)(A); *see also* 20 C.F.R. § 404.1505(a).

Disability is determined according to a five-step, sequential evaluation process. 20 C.F.R. § 404.1520(a)(4).

> To determine disability, the ALJ follows the familiar five-step process, considering whether: (1) the claimant was employed; (2) []he was severely impaired; (3) h[is] impairment was, or was comparable to, a listed impairment; (4) []he could perform past relevant work; and if not, (5) whether []he could perform any other kind of work.

*Halverson v. Astrue*, 600 F.3d 922, 929 (8th Cir. 2010). In general, the burden of proving the existence of disability lies with the claimant. 20 C.F.R. § 404.1512(a).

Plaintiff asserts that the ALJ erred by failing to determine whether his cane was medically required and did not adequately evaluate his assertion that he needed a cane to balance and ambulate.

### A. Medical Records

Because of the nature of DIB, Plaintiff must establish that he was disabled before his insurance expired in December 2019 in order to be entitled to benefits. *Moore v. Astrue*, 572 F.3d 520, 522 (8th Cir. 2009) (citing *Cox v. Barnhart*, 471 F.3d 902, 907 (8th Cir. 2006)); *see Michelle P. v. Berryhill*, No. 17-cv-4286 (HB), 2019 WL 1318352, at *1 n.4 (D. Minn. Mar. 22, 2019) ("[T]he date of last insurance is the last date an individual is eligible to receive DIB in view of [his] earnings record.  Thus, the claimant must establish disability on or before that date in order to be entitled to DIB."), *aff'd sub nom. Palmer v. Saul*, 798 F. App'x 44 (8th Cir. 2020) (per curiam).

### 1.  2014

In January 2014, Plaintiff went to the emergency room after "he slipped on the ice and rolled his ankle."  Tr. 302; *see* Tr. 43.  Plaintiff experienced "immediate pain to his right ankle" and was unable to walk due to the pain.  Tr. 302.  Upon examination, Plaintiff had "an obvious deformity to the right ankle with a small abrasion over the medial malleolus."  Tr. 303.  Plaintiff was "tender to palpation over the ankle with decreased [range of motion] due to pain."  Tr. 303.  "X-ray of the right ankle show[ed] a fracture subluxation of the ankle with a comminuted fracture of the distal fibula, [and] the talus [wa]s displaced laterally."  Tr. 303; *see also* Tr. 306 ("fracture-dislocation of his ankle with significant tenting of the skin medially"), 310 (same).  An open reduction internal fixation procedure was performed by Paul M. Lafferty, MD.  Tr. 306, 310, 323-27.  At the time of discharge, Plaintiff was instructed to "remain nonweightbearing in his

6

splint for the next 2 weeks"; "elevate his leg"; and "remain nonweightbearing for [a] minimum of 10 weeks."  Tr. 307; *see also* Tr. 311 (same).

Plaintiff was discharged to a transitional care facility, where he remained for a few weeks.  Tr. 350; *see* Tr. 363-81.  While in transitional care, Plaintiff reported pain and soreness in his right ankle.  *See, e.g.*, Tr. 364, 367, 370.  *But see* Tr. 631 ("He reports minimal pain.").  During a follow-up examination by Dr. Lafferty in early February, Plaintiff was noted to have "ok" range of motion in his right ankle, but was to continue to elevate his leg to reduce swelling.  Tr. 379.  Plaintiff was to use a "CAM boot whenever [he was] up and out of bed" and not to do any weight-bearing on his right leg until cleared to do so by Dr. Lafferty.  Tr. 380; *see also* Tr. 631 (removing splint and placing Plaintiff in CAM boot).  At the time he was discharged to home, Plaintiff's "[g]ait [was] strong and balanced using [a] rolling walker."  Tr. 380; *see also* Tr. 631 ("using walker for ambulation assistance").

Plaintiff had one follow-up appointment in March and two in April.  Tr. 385-99, 637-45, 654-55.  Plaintiff was noted to be progressing well.  Tr. 385, 391, 397, 637, 643, 655.  Plaintiff was prescribed physical therapy for gait training, progressive strengthening, and ankle range of motion.  Tr. 386, 392, 397, 638.  At the first April appointment, Plaintiff was instructed that he could bear weight with his right leg "as tolerated" while wearing the CAM boot.  Tr. 392, 644.  Approximately two weeks later, Plaintiff was instructed that he could "wean from [the CAM] boot into a well supportive shoe over the next 1-2 weeks."  Tr. 397, 654.  On two occasions, Plaintiff was noted to be using a walker for assistance with ambulation.  Tr. 385, 391, 637.  On one occasion,

Plaintiff was noted to be using a cane.  Tr. 397, 654.  Plaintiff was instructed to wean himself off of using the "crutches/cane" once he had progressed to full weight bearing. Tr. 398, 655.

Plaintiff participated in physical therapy between April and June.  Tr. 647-50, 658-79, 1020-46.  At his initial visit, Plaintiff "arrive[d] using [a] rolling walker with [the] boot on [his] foot."  Tr. 648, 1021.  It was noted that Plaintiff came "close to hitting [the] boot on [the] walker frequently so [he] has to push out far in front of him."  Tr. 648, 1021.  Plaintiff reported that his pain was aggravated by spending too much time on his feet.  Tr. 647, 1020.  Plaintiff was noted to be "limited to walking 100 yards" using an assistive device.  Tr. 647, 1020.  With trying a cane, Plaintiff "showed an improved upright posture and more natural reciprocal gate pattern."  Tr. 648, 1021.

At his next two physical therapy appointments, Plaintiff was using a cane, but "not wearing [the] boot."  Tr. 658, 661, 1025, 1028.  Plaintiff was noted to ambulate "with a slow antalgic gait pattern."  Tr. 658, 661, 1025, 1028.  Toward the end of April, Plaintiff "was able to ambulate without the cane throughout the clinic" during the session.  Tr. 662, 1029.  In early May, Plaintiff reported that "he's been doing most of his walking without use of a cane but still uses the cane outside of the house."  Tr. 665, 1032.  During this session, Plaintiff was using the cane when he arrived, but able to ambulate in the clinic without it, although an "increased limp favoring the right lower extremity" was observed.  Tr. 665, 1032; *see also* Tr. 669, 672, 1036, 1039.

Toward the end of May, Plaintiff was carrying the cane upon arrival.  Tr. 675, 1042.  Plaintiff had "[b]etter heel to toe pattern" and his gait was "slightly antalgic

8

favoring [the] right." Tr. 675, 1042. Plaintiff reported noticing that his leg is getting stronger. Tr. 675, 1042. Plaintiff was noted to be "doing pretty well in terms of pain level but does get sore with longer periods of time on his feet." Tr. 676, 1043. It was additionally noted that Plaintiff is "nearly done using the cane but does still use it lightly when the ankle gets sore." Tr. 676, 1043. At his next and last appointment approximately three weeks later, Plaintiff reported that "[h]e still uses the cane occasionally if the ankle is sore." Tr. 678, 1045. It was noted that Plaintiff did not have his cane with him and while his gait "[a]ppear[ed] a little stiff for the first few steps," it then "improved to nearly normal pattern." Tr. 678, 1045. While Plaintiff "continue[d] to make progress in terms of pain levels and gait," he was "still very weak with ankle inversion/eversion and still ha[d] quite a bit of swelling after standing at work." Tr. 679, 1046.

In mid-July, Plaintiff followed up with Dr. Lafferty. Tr. 402, 682. Plaintiff reported that he was "doing very well overall" and his pain had decreased. Tr. 402, 682. Plaintiff described his pain as "dull," rating it "at a 1 on a 1-10 scale," and stated that it "[c]omes and goes." Tr. 402, 682. Plaintiff's pain occurred "primarily after extensive periods of ambulation and weightbearing." Tr. 402, 682. Plaintiff also experienced "activity and gravity dependent swelling," which was "relieved with rest and elevation." Tr. 402, 682. Imaging showed, however, "[r]ight distal fibula nonunion with tibiotalar malalignment." Tr. 402, 682. Dr. Lafferty ordered a CT scan of Plaintiff's right ankle and advised him that he could continue "weight-bear[ing] to tolerance and perform[ing] range of motion [to] tolerance[,] but should avoid high-impact activities." Tr. 402, 682.

The CT scan revealed "fibular non-union/delayed union with malreduction of the syndesmosis and lateral tibial plafond impaction." Tr. 407, 687.

Plaintiff met with Sarah A. Anderson, MD, in August to discuss treatment options. Tr. 406, 686. Plaintiff told Dr. Anderson that, "[a]fter transitioning [into] street shoes," he experienced "significant pain and swelling." Tr. 406, 686. Plaintiff had "no pain at rest, but severe pain with activity." Tr. 406, 686. While Plaintiff attended physical therapy, he reported "that it did more harm than good." Tr. 406, 686. Plaintiff told Dr. Anderson that he "would like to avoid another surgery if possible." Tr. 406, 686.

Dr. Anderson diagnosed Plaintiff with "[v]algus collapse of [the] ankle with impaction of the lateral tibial plafond" and "[f]ibular delayed union." Tr. 407, 687. Dr. Anderson advised that the best course of treatment would be additional surgery, which would also likely entail "8-10 weeks of non-weightbearing." Tr. 407, 687. Plaintiff was "really opposed to a big additional surgery." Tr. 407, 687. In the alternative, Dr. Anderson recommended "getting [Plaintiff] into a well molded Arizona AFO [foot brace] to keep the ankle neutral,"[3] using "a bone stimulator to attempt to further the fibular healing," and "keep[ing] off of the ankle as much as possible for another 6-8 weeks to see if we can't turn things around." Tr. 407, 687.

When Plaintiff saw Dr. Anderson again in October, he was using the foot brace, felt that "his swelling and pain . . . [have] both decreased," and was "able to do more of

---

[3] At the hearing, Plaintiff described the foot brace as lace-up brace he wore over a compression sock. Tr. 45; *see* Tr. 45-47. The brace "went up almost to [Plaintiff's] knee." Tr. 53. Plaintiff was not able to wear a shoe with it and wore the CAM boot on top of it. *See* Tr. 45-47, 53. The Commissioner states that "[s]ome doctors referred to the CAM boot as an Arizona AFO." Comm'r's Mem. in Supp. at 1 n.1, ECF No. 22. As the Court reads the record, the CAM boot and the foot brace are different devices. In the end, for purposes of this case, the precise nature of the medical equipment worn by Plaintiff on his right foot is not dispositive.

his desired activities."  Tr. 413, 693.  A CT scan of Plaintiff's right ankle showed "[p]rogressive tibial plafond destruction" and "post-traumatic arthritis."  Tr. 413, 693.  Dr. Anderson noted that she "cannot explain why [Plaintiff's] symptoms are actually better, but given this certainly there is no rush to move to an ankle fusion." Tr. 413, 693.  Plaintiff was again noted to be "not interested in more surgery." Tr. 413, 693.  Plaintiff was to continue using the foot brace, weight-bearing as tolerated, and follow up in three months.  Tr. 413-14, 693-94.

### 2.  2015

Plaintiff saw Dr. Anderson again near the end of January 2015.  Tr. 416, 696.  Plaintiff was still using the foot brace for walking.  Tr. 416, 696.  He continued to "feel[] that things are progressively better" and "[d]enie[d] any significant pain in the ankle." Tr. 416, 696.  Imaging showed that there was "progressive collapse into valgus of the tibial plafond with the hardware at the distal fibula pulling out and the plate now extending distal to the bone."  Tr. 416, 696; *see* Tr. 419, 699 ("[T]he plate along the fibula is prominent and there are broken screws.").  Dr. Anderson was "concerned with [the] ongoing collapse," but, "without pain along the lateral ankle and no risk of the skin at this point, [she] did not see urgent need to remove the fibular plate." Tr. 416, 696.  Dr. Anderson instructed Plaintiff to monitor for "pain or skin issues."  Tr. 416, 419, 696, 699.

At his next appointment at the end of April, there were "[n]o significant changes." Tr. 423, 703.   Plaintiff still had "pain with ambulation," but it was "significantly

improved while wearing his [A]rizona brace." Tr. 423, 703. Monofilament testing[4] revealed "loss of sensation distal to MT heads." Tr. 423, 703. Imaging showed a "stable 10 degree collapse into valgus of the tibial plafond with the hardware at the distal fibula plate extending distal to the bone." Tr. 423, 703. "The distal fibular screw heads [we]re broken but remain[ed] a[t the] same position." Tr. 423, 703. Dr. Anderson noted that the fibular delayed union was "now healed." Tr. 423, 703. Plaintiff was directed to continue using the brace and encouraged to perform low-impact exercise. Tr. 423, 703.

When Plaintiff was seen again in December, "he fe[lt] essentially the same" and had "no pain or skin concerns." Tr. 427, 707. Plaintiff reported wearing his foot brace for most of the day and "remov[ing it] at night around the house." Tr. 427, 707. Imaging showed "stable valgus ankle arthritis" with a "[c]omplete failure of [the] distal fibular hardware without change." Tr. 427, 707. There was possible "slight posterior translation of talus compared with previous views," but this was also thought to "be rotational." Tr. 427, 707. Dr. Anderson instructed Plaintiff to continue using his foot brace "for most of his ambulation" and monitoring for "changes in skin, swelling or shape of the ankle." Tr. 427, 707.

---

[4] "A monofilament test is done to test for nerve damage (peripheral neuropathy) . . . . The monofilament is a small strand of nylon attached to a plastic base. The provider uses this monofilament to check for loss of feeling on . . . [the patient's] foot." *Monofilament Test*, MedlinePlus, U.S. Nat'l Lib. of Med., https://medlineplus.gov/ency/imagepages/19960.htm (last accessed Mar. 13, 2023); *see also* Podiatry Malpractice Litig. § 27, 85 Am. Jur. Trials 189 ("In this test, a single filament is pressed against the skin until it just begins to bend. If a sense of pressure is not felt with a filament of size 6.10, then there is significant sensory impairment.").

### 3. 2016

When Plaintiff saw Dr. Anderson again in June 2016, he "fe[lt] about the same." Tr. 433, 713. While Plaintiff stated "he may be having slightly more aching," he also was "doing much more walking." Tr. 433, 713. Plaintiff used his foot "brace most of the day, most days." Tr. 433, 713. Plaintiff also thought his foot brace might be wearing out and asked about getting a new one. Tr. 433, 713. Similar to his last visit, imaging showed "stable valgus ankle arthritis," "[c]omplete failure of distal fibular hardware without change," and "[s]table slight posterior translation of talus." Tr. 433, 713.

Dr. Anderson listed Plaintiff's diagnoses as "[r]ight ankle malunion with valgus arthritis" and "[s]ensory neuropathy." Tr. 433, 713. Dr. Anderson noted that Plaintiff's "deformity in general is pretty stable at this point," though it could still "worsen[] over time." Tr. 433, 713. She discussed with Plaintiff "that the ankle will never be normal, and that the only real way to make it better (less pain, better function perhaps) would be a major reconstructive surgery." Tr. 433, 713. Plaintiff was "content with his status at this point." Tr. 433, 713. Dr. Anderson "place[d] orders to have [Plaintiff's] current brace assessed and possibly replaced pending their review." Tr. 433, 713.

During a hospitalization for an unrelated condition in October, it was noted that Plaintiff had a normal gait and full strength and range of motion in his lower extremities. Tr. 440, 513, 523, 1050, 1060.

### 4. 2017

In January 2017, during a follow-up for an unrelated condition, Plaintiff requested renewal of his "disability sticker, since he has a fall risk and sometimes uses a cane." Tr.

456. Plaintiff's "disability placard [was] renew[ed] for 48 months for his ankle arthritis." Tr. 460.

Plaintiff was seen in the emergency room in February for injuries to his face after slipping on some ice and falling face first onto his asphalt driveway. Tr. 466-70, 575, 1112-30. Plaintiff's wife reported that "he has some disability due to prior right ankle injury and is unsteady on his feet." Tr. 575, 1112. Plaintiff "appear[ed] to be mildly intoxicated." Tr. 578, 1115. In a follow-up visit, it was noted that Plaintiff's alcohol-level was "elevated" when he sought treatment for the fall. Tr. 472. It was noted that Plaintiff "[f]eels that the falls are secondary to the right ankle arthritis but not [t]he alcohol." Tr. 472. Plaintiff was "referred . . . back to orthopedics" for right ankle arthralgia. Tr. 473.

Towards the end of November, Plaintiff met with Ariel R. Centurion, MD, to establish care. Tr. 486. Plaintiff voiced no concerns. Tr. 486. Plaintiff reported that he "walks x 1.5 hours once a week" for exercise and engages in limited exercise due to chronic pain in his right ankle from the arthritis. Tr. 486. Upon examination, Dr. Centurion noted that Plaintiff ambulated without assistance, describing his gait as "normal, non-antalgic, no limping." Tr. 488. Dr. Centurion recommended that Plaintiff increase exercise for his overall health. *See* Tr. 490-91.

### 5. 2018

During a hospitalization for an unrelated condition in July 2018, Plaintiff was noted to have full strength in his lower extremities. Tr. 1222. At the end of September,

during a follow-up appointment for an unrelated condition, Plaintiff reported that he was "now able to walk 2 blocks without difficulty." Tr. 762.

### 6. 2019

Towards the end of March 2019 at a follow-up appointment for an unrelated condition, Plaintiff reported that "he generally feels well" and "walks for up to half the day without a problem, except for occasional ankle soreness." Tr. 755.

### 7. 2020

Approximately one year later, during a similar follow-up appointment in March 2020, Plaintiff reported that "[h]e continues to walk 4 hours a day with stable stamina." Tr. 741.

## B. Function Report & Hearing Testimony

In a function report completed by Plaintiff's wife, she noted that Plaintiff used a cane, walker, and a "brace/splint." Tr. 198; *see* Tr. 197. Plaintiff's wife reported that he needed the brace and cane to walk. Tr. 198.

At the hearing, Plaintiff testified that he has been using a cane ever since the accident in January 2014. Tr. 48. Plaintiff testified that he used the cane whenever he was walking because his "ankle goes numb and sometimes [he] lose[s his] balance." Tr. 48. When asked by the ALJ if Plaintiff took his cane with him to medical appointments, Plaintiff testified that he took it with him "almost every time." Tr. 48. Plaintiff testified that the cane was prescribed and "they told [him he] should have a cane" and "where to get it." Tr. 49. The vocational expert testified that an individual needing to use a cane would not be capable performing Plaintiff's past work. Tr. 60-61.

15

### C. Determination of Plaintiff's Residual Functional Capacity

Plaintiff's assignments of error are directed at the ALJ's determination of his residual functional capacity.  A claimant's "residual functional capacity is the most [he] can do despite [his] limitations."  20 C.F.R. § 404.1545(a)(1); *see McCoy v. Astrue*, 648 F.3d 605, 614 (8th Cir. 2011) ("A claimant's [residual functional capacity] represents the most he can do despite the combined effects of all of his credible limitations and must be based on all credible evidence."); *see also, e.g.*, *Schmitt v. Kijakazi*, 27 F.4th 1353, 1360 (8th Cir. 2022).  It includes "functional limitations and restrictions that result from an individual's medical determinable impairment or combination of impairments, including the impact of any related symptoms."  *Titles II & XVI: Assessing Residual Functional Capacity in Initial Claims*, SSR 96-8p, 1996 WL 374184, at *1 (Soc. Sec. Admin. July 2, 1996).  Ultimately, it is Plaintiff's burden to establish his residual functional capacity. *Mabry v. Colvin*, 815 F.3d 386, 390 (8th Cir. 2016).

"Because a claimant's [residual functional capacity] is a medical question, an ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to function in the workplace."  *Perks*, 687 F.3d at 1092 (quotation omitted); *accord Schmitt*, 27 F.4th at 1360.  At the same time, the residual-functional-capacity determination "is a decision reserved to the agency such that it is neither delegated to medical professionals nor determined exclusively based on the contents of medical records."  *Norper v. Saul*, 964 F.3d 738, 744 (8th Cir. 2020); *see Perks*, 687 F.3d at 1092; *see also* 20 C.F.R. § 404.1546(c).  "An ALJ determines a claimant's [residual functional capacity] based on all the relevant evidence, including the medical records, observations

of treating physicians and others, and an individual's own description of [his or her] limitations." *Combs v. Berryhill*, 878 F.3d 642, 646 (8th Cir. 2017) (quotation omitted); *accord Schmitt*, 27 F.4th at 1360; *Norper*, 964 F.3d at 744-45.

### 1.  Not Medically Required

Plaintiff asserts that the ALJ erred by failing to determine whether his cane was medically required.  Plaintiff asserts "that the ALJ made no specific findings as to whether the cane's use remained medically required and supported by the medical record and failed to reference or comply with SSR 96-9p."  Pl.'s Mem. in Supp. at 9, ECF No. 20.

Use of a hand-held assistive device can affect a claimant's abilities to lift and carry.  20 C.F.R. pt. 404, subpt. P, app. 1, § 1.00J4 ("The requirement to use a hand-held assistive device may also impact on the individual's functional capacity by virtue of the fact that one or both upper extremities are not available for such activities as lifting, carrying, pushing, and pulling."); Soc. Sec. Ruling 96-9p, *Titles II & XVI: Determining Capability to Do Other Work—Implications of a Residual Functional Capacity for Less Than a Full Range of Sedentary Work*, 1996 WL 374185, at *7 (Soc. Sec. Admin. July 2, 1996) [hereinafter SSR 96-9p].[5]  "An ALJ must consider limitations resulting from a

---

[5] The Commissioner contends that SSR 96-9p does not apply here because the ALJ found that Plaintiff was capable of performing some *light* work and, as reflected in its title, SSR 96-9p applies to *sedentary* work.  *See* Comm'r's Mem. in Supp. at 7.  It is true that the stated purpose of SSR 96-9p is "[t]o explain the Social Security Administration's policies regarding the impact of a residual functional capacity . . . assessment for less than a full range of *sedentary* work on an individual's ability to do other work."  1996 WL 374185, at *1 (emphasis added).  Courts have, however, regularly looked to SSR 96-9p's discussion of hand-held assistive devices at other exertional levels, including light work.  *See, e.g.*, *Lopez v. Kijakazi*, No. 6:60-cv-03470-KFM, 2021 WL 9583497, at *2, 4-5 (D. S.C. July 20, 2021) (light work); *Mya Y. v. Saul*, No. 20-cv-1296 (JRT/LIB), 2021 WL 3023691, at *3-4 (D. Minn. June 28, 2021) (same), *report and recommendation adopted*, 2021 WL 3022723 (D. Minn. July 16, 2021); *Temple v. Saul*, No. 4:19-cv-3320, 2020 WL 6075644, at *1, 3-4 (S.D. Tex. Oct. 14, 2020) (same); *Patricia M. v.*

claimant's use of a cane only if the cane is 'medically necessary' or 'medically required.'" *Mya Y.*, 2021 WL 3023691, at *4; *see Raney v. Barnhart*, 396 F.3d 1007, 1010 (8th Cir. 2005) (noting absence of "medical records or opinions documenting Raney's use of a cane as being medically necessary").

"To find a hand-held assistive device is medically required, there must be medical documentation establishing the need for a hand-held assistive device to aid in walking or standing, and describing the circumstances for which it is needed." SSR 96-9p, 1996 WL 374185, at *7; *see Patricia M.*, 2020 WL 3633218, at *7 ("Plaintiff must show the cane is medically required by offering medical documentation that (1) demonstrates the cane is necessary to help her walk or stand and (2) describes the circumstances in which the device is needed . . . ."); *see also* 20 C.F.R. pt. 404, subpt. P, app. 1, § 1.00J4 ("The medical basis for the use of any assistive device (e.g., instability, weakness) should be documented.").

Whether a hand-held assistive device is medically required is based on "the particular facts of a case." SSR 96-9p, 1996 WL 374185, at *7. A prescription is not required.[6] *See Staples v. Astrue*, 329 F. App'x 189, 191-92 (10th Cir. 2009) ("The

---

*Saul*, No. 18-cv-3462, 2020 WL 3633218, at *1, 7-9 (D. Minn. Feb. 5, 2020) (same), *report and recommendation adopted sub nom. McArdell v. Saul*, 2020 WL 1951748 (D. Minn. Apr. 23, 2020); *Whayne v. Comm'r of Soc. Sec.*, No. 17-cv-10262, 2018 WL 1256237, at *2-4 (E.D. Mich. Mar. 12, 2018) (same); *Scheuvront v. Berryhill*, No. 3:17-CV-84, 2018 WL 3148230, at *22, 4-6 (N.D. W. Va. Feb. 8, 2018) (same); *Richmond v. Berryhill*, No. 16-CV-140-LRR, 2017 WL 4074633, at *3, 4 (N.D. Ia. Sept. 14, 2017) (same). As one court explained it: "While SSR 96-9p applies on its face to claimants with sedentary [residual functional capacities], courts . . . have found it instructive at other exertional levels as it relates to hand-held assistive devices, because those other levels involve even greater lifting than sedentary work." *Lopez*, 2021 WL 9583497, at *4 n.4.

　　Moreover, as relevant here, SSR 96-9p echoes the regulations for musculoskeletal disorders in 20 C.F.R. pt. 404, subpt. P, app. 1, § 1.00. The ALJ considered whether Plaintiff's ankle impairments and assertion of disability "based on limited ambulation and use of a cane" met or equaled a listed musculoskeletal disorder. Tr. 20.

[6] The Eighth Circuit has, however "noted the difference between a physician-prescribed assistive device and a claimant's self-adopted assistive device." *Edwards v. Berryhill*, No. 5:17-CV-05092-KES, 2019 WL 1320314, at

standard described in SSR 96-9p does not require that the claimant have a prescription for the assistive device in order for that device to be medically relevant to the calculation of her [residual functional capacity].   Instead, she only needs to present medical documentation establishing the need for the device."); *Emery v. Berryhill*, No. 17-cv-1988 (TNL), 2018 WL 4407441, at *2 (D. Minn. Sept. 17, 2018) (same); *cf. Lopez*, 2021 WL 9583497, at *4 ("[A] prescription or the lack of a prescription for an assistive device is not necessarily dispositive of medical necessity." (quotation omitted)).   "The Eighth Circuit has not addressed what precise documentation a claimant must provide to establish the limitation of a medically required assistive device."   *Edwards*, 2019 WL 1320314, at *14; *accord Mya Y.*, 2021 WL 3023691, at *5; *Patricia M.*, 2020 WL 3633218, at *8.   "[T]he Third, Seventh, and Tenth Circuits have required an unambiguous opinion from a physician stating the circumstances in which the assistive device is medically necessary."   *Edwards*, 2019 WL 1320314, at *14 (citing *Tripp v. Astrue*, 489 F. App'x 951, 954 (7th Cir. 2012); *Staples*, 329 F. App'x at 191-92; *Howze v. Barnhart*, 53 F. App'x 218, 222 (3d Cir. 2022)); *accord Mya Y.*, 2021 WL 3023691, at *5; *Patricia M.*, 2020 WL 3633218, at *8; *see also Dean N. v. Saul*, No. CV 18-009840-DFM, 2020 WL 430962, at *2 (C.D. Cal. Jan. 28, 2020) ("Without a physician describing the circumstances for which the cane is needed, the ALJ cannot find the cane medically necessary." (quotation omitted)).

---

*14 (D. S.D. Mar. 22, 2019) (citing *Toland v. Colvin*, 761 F.3d 931, 936 (8th Cir. 2014)); *cf. Patricia M.*, 2020 WL 3633218, at *7 ("A prescription (or lack of a prescription) for an assistive device is not necessarily dispositive of the presence or absence of medical necessity, but it is important to the ALJ's analysis." (citations omitted)).

The ALJ's acknowledgement of Plaintiff's allegations of disability based on limitation in his ability to ambulate and his use of a cane and discussion of the pertinent medical evidence reflects that the ALJ considered whether Plaintiff's use of a cane was medically required and supported by medical evidence, making it distinguishable from *Emery*. *Contra* 2018 WL 4407441, at *3. When analyzing whether Plaintiff's ankle impairments met or equaled a listed impairment, the ALJ chronicled Plaintiff's medical treatment following the January 2014 accident. The ALJ noted that, in the months of February, March, and April, Plaintiff was noted to be using a walker and a cane. Tr. 20-21. But, in May, Plaintiff was "carrying his cane" and, in June, Plaintiff "presented without a cane or boot." Tr. 21. The ALJ described Plaintiff's treatment with Dr. Anderson and how subsequent records in 2015 and 2016 showed improved functioning with the use of the foot brace and Plaintiff was doing more walking. Tr. 21-22. The ALJ accurately observed that, although Plaintiff's disability placard was renewed at his request in early 2017, "no observations or findings related to gait or use of a cane [were made] at that visit" and only "some right ankle swelling" was noted. Tr. 23; *see* Tr. 458. And, when Plaintiff went to establish care with another provider later that year, "[e]xamination showed [Plaintiff] as ambulatory without assistance" and his "[g]ait was normal and non-antalgic." Tr. 23; *see* Tr. 488.

Incorporating this discussion by reference into the later analysis of Plaintiff's residual functional capacity, the ALJ reasoned:

> The claimant was seen in clinic using a cane in mid-2014, but then advised to wean from the CAM boot and cane, which is documented in physical therapy records. He subsequently

> followed with . . . [the foot] brace and gradually improved functioning. In January 2017, he requested a renewal of his disability sticking [sic] given his fall risk due to his ankle and sometimes using a cane. [The treatment provider] noted some right ankle swelling, but no observations or findings related to gait or use of a cane at that visit. [The treatment provider] gave him a disability placard renewal for 48 months, but as noted, there is no confirmed medical necessity.

Tr. 25.

Plaintiff points to observations of his treatment providers documenting use of a cane, his testimony at the hearing, and his wife's observations. While Plaintiff was observed to be using an assistive device in the first half of 2014, Plaintiff's citations to observations by his treatment providers of him using "an assistive device does not equate to medical documentation that establishes the need for the device and a description of the circumstances for which it is needed." *Edwards*, 2019 WL 1320314, at *15; *accord Mya Y.*, 2021 WL 3023691, at *5; *see Dean N.*, 2020 WL 430962, at *2 ("Nor does the fact that various medical providers noted plaintiff's use of a cane establish its medical necessity."). Moreover, unlike *Emery*, it cannot be said that the medical records reflect Plaintiff's ongoing, consistent use of a cane. *Contra* 2018 WL 4407441, at *3. Nor can Plaintiff's testimony or the observations of his wife constitute the required medical documentation establishing the need for a cane. *See Mya Y.*, 2021 WL 3023691, at *5; *Dean N.*, 2020 WL 430962, at *2. Respectfully, "even assuming that Plaintiff frequently used [his] cane, that does not necessarily mean the cane was medically necessary as opposed to simply preferred." *Patricia M.*, 2020 WL 3633218, at *8; *cf. Toland*, 761 F.3d at 936.

21

In sum, Plaintiff has not met his burden to show that his use of a cane was medically required and the ALJ's conclusion that it was not is supported by substantial evidence in the record as a whole.

### 2. Own Statements Regarding Use of a Cane Not Sufficient

Plaintiff next asserts the ALJ did not properly evaluate his own statements about the intensity, persistence, and limiting effects of his symptoms and "stated need for a cane." Pl.'s Mem. in Supp. at 11. Plaintiff asserts that the ALJ "provides no explanation of what medical evidence disputed Plaintiff's claim that he required a cane to balance and ambulate." Pl.'s Mem. in Supp. at 12.

When determining a claimant's residual functional capacity, an ALJ takes into account the claimant's symptoms, such as pain, and evaluates the intensity, persistence, and limiting effects of those symptoms. *Titles II and XVI: Evaluation of Symptoms in Disability Claims*, SSR 16-3p, 2016 WL 1119029, at *2 (Soc. Sec. Admin. Mar. 16, 2016) [hereinafter SSR 16-3p]; *see, e.g.*, *Bryant v. Colvin*, 861 F.3d 779, 782 (8th Cir. 2017) ("Part of the [residual-functional-capacity] determination includes an assessment of the claimant's credibility regarding subjective complaints.").

> In considering the intensity, persistence, and limiting effects of an individual's symptoms, [the ALJ] examine[s] the entire case record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case record.

SSR 16-3p, 2016 WL 1119029, at *4. Such evaluation includes consideration of "(i) the claimant's daily activities; (ii) the duration, frequency, and intensity of the claimant's

pain; (iii) precipitating and aggravating factors; (iv) the dosage, effectiveness, and side effects of medication; and (v) the claimant's functional restrictions." *Vance v. Berryhill*, 860 F.3d 1114, 1120 (8th Cir. 2017); *see* 20 C.F.R. § 404.1529(c)(3); SSR 16-3p, 2016 WL 1119029, at *7.

"Credibility determinations are the province of the ALJ, and as long as good reasons and substantial evidence support the ALJ's evaluation of credibility, [courts] will defer to [the ALJ's] decision." *Julin v. Colvin*, 826 F.3d 1082, 1086 (8th Cir. 2016) (quotation omitted); *see Grindley*, 9 F.4th at 630 ("We normally defer to an ALJ's credibility determination."); *Hensley v. Colvin*, 829 F.3d 926, 934 (8th Cir. 2016) ("We will defer to an ALJ's credibility finding as long as the ALJ explicitly discredits a claimant's testimony and gives a good reason for doing so." (quotation omitted)).

The Court agrees with the Commissioner that Plaintiff is essentially repackaging his challenge to the ALJ's finding of no medical necessity. Again, "Plaintiff's own reports that []he needs a cane to walk or stand are patently not medical evidence that establish the need for [his] cane or a description of the circumstances for which it is needed." *Mya Y.*, 2021 WL 3023691; *see also Patricia M.*, 2020 WL 3633218, at *7; *Dean N.*, 2020 WL 430962, at *2; *cf. Toland*, 761 F. 3d at 936.

Additionally, the ALJ *did* discuss the medical evidence regarding Plaintiff's abilities to ambulate and balance. While this evidence was discussed earlier in the decision and incorporated by reference later on, it is not accurate to state that there was no discussion of the medical evidence regarding Plaintiff's abilities to ambulate and balance. Among other things, the ALJ noted that "Dr. Lafferty released [Plaintiff] to

23

weight bearing as tolerated, but advised against high impact activities" in July 2014.  Tr. 21.  As discussed above, the ALJ described Plaintiff's treatment with Dr. Anderson and how subsequent records in 2015 and 2016 showed improved functioning and that Plaintiff was doing more walking.  The ALJ noted that Plaintiff had a "normal gait" in October 2016.  Tr. 22.  Recognizing that Plaintiff fell in early 2017, the ALJ also noted that, while Plaintiff "attributed his fall to his right ankle," treatment providers suspected alcohol may have been a factor.  Tr. 23.  And again as noted above, the ALJ pointed out that Plaintiff's disability placard was renewed despite there being "no observations or findings related to gait or use of a cane at that visit" and Plaintiff was noted to ambulate "without assistance" and have a normal gait later that same year.  Tr. 23. Additionally, the ALJ noted that, in 2018, Plaintiff "reported an improvement in stamina allowing walking 2 blocks without difficulty."  Tr. 24.

The ALJ also considered the statements Plaintiff and his wife made about his limitations in light of other evidence in the record.  The ALJ acknowledged that Plaintiff "reported reduced ambulation and imbalance with neuropathy and use of cane since his accident," Tr. 25, and Plaintiff's wife "reported on [his] generally limited and sedentary activity at home having meals and watching television," Tr. 26.  The ALJ concluded, however, that Plaintiff's overall functioning exceeded both "his testimony of functional limitations" and "the activity reported by his wife."  Tr. 26.  In particular, the ALJ noted that, in 2019, Plaintiff "reported feeling well, walking up to half the day without problem," and denied having any falls.  Tr. 24; *see* Tr. 26.  Plaintiff again denied having

any falls in the first part of 2020 and reported that "[h]e continued to walk 4 hours per day with stable stamina."  Tr. 24; *see* Tr. 26.

In sum, for the reasons stated in this section and the preceding section, there is substantial evidence in the record as a whole to support the ALJ's conclusion that there was no need for a limitation in the residual functional capacity restricting Plaintiff to use of a cane.

## V. ORDER

Based upon the record, memoranda, and the proceedings herein, and for the reasons stated above, **IT IS HEREBY ORDERED** that:

1. Plaintiff's Motion for Summary Judgment, ECF No. 19, is **DENIED**.

2. The Commissioner's Motion for Summary Judgment, ECF No. 21, is **GRANTED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: March__28__, 2023                          _____*s/ Tony N. Leung*_____
                                                                          Tony N. Leung
                                                                          United States Magistrate Judge
                                                                          District of Minnesota


                                                                          *Kurt E. H. v. Kijakazi*
                                                                          Case No. 21-cv-1859 (TNL)